# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| DONALD OLMSTED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV203 RWS(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Donald Olmsted for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 18). Defendant has filed a Brief in Support of the Answer. (Doc. No. 22).

## Procedural History

On May 3, 2002, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on February 25, 2001. (Tr. 89-91, 776-77). Plaintiff's claims were denied initially. (Tr. 74-77). On January 28, 2005, following an administrative hearing, an ALJ issued a partially favorable decision, finding that plaintiff was disabled for the

period of February 25, 2001 through October 12, 2002, but was not disabled beginning October 13, 2002.  (Tr. 16-22).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 4, 2006.  (Tr. 13, 8-10).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on January 29, 2004.  (Tr. 38).  Plaintiff was present and was represented by counsel.  (Id.).  The ALJ began the hearing by admitting the exhibits into evidence.  (Tr. 39).  Plaintiff's attorney requested that the ALJ leave the record open so that he could submit recent medical records from Dr. Crafts, a Saint Louis University neurosurgeon that plaintiff sees at the Veteran's Administration Medical Center ("VA").  (Id.).  The ALJ indicated that he would leave the record open for thirty days.  (Id.).

The ALJ then examined plaintiff, who testified that he was forty-two years of age.  (Tr. 40).  Plaintiff stated that he lives in a nursing home and that he had been living there for twenty-six months.  (Id.).  Plaintiff testified that the nursing home provided him with a cab voucher, which he used to get to the hearing.  (Id.).  Plaintiff stated that he does not drive because his doctors have advised him not to drive.  (Id.).  Plaintiff testified that he does have a driver's license.  (Tr. 41).

Plaintiff stated that he dropped out of high school but received a Bachelors of Arts degree in Anthropology from Northwestern State University of Louisiana in 1987.  (Id.).  Plaintiff testified that he fueled aircrafts in the United States Navy for two-and-a-half years.  (Id.).

Plaintiff stated that his last position was at Xerox in New Orleans, Louisiana, as an auditor of accounts payable for Texaco Oil Exploration. (Id.). Plaintiff testified that when Xerox lost the auditing part of the Texaco contract, he began operating copy machines. (Tr. 42). Plaintiff stated that he performed these duties for the last seven months he worked for Xerox. (Id.). Plaintiff testified that he left Xerox because he was unable to perform the position due to his neck problems. (Id.). Plaintiff stated that the position involved picking up boxes of paper. (Id.). Plaintiff testified that he was an employee of Xerox for two years. (Id.). Plaintiff stated that he worked at Xerox as an employee of Manpower for two years prior to being hired by Xerox. (Id.).

Plaintiff testified that he was unemployed for two-and-a-half years, beginning in 1995, prior to being hired by Manpower. (Tr. 43). Plaintiff stated that he started working for Manpower in 1997. (Tr. 44).

Plaintiff testified that he worked for Crescent Bank and Trust in 1994 as a collections officer. (Id.). Plaintiff stated that he worked for F-Co Financial in 1993 as a collections officer. (Id.). Plaintiff testified that he worked for Pelican Homestead and Savings as a collections officer prior to working for F-Co Financial. (Id.). Plaintiff stated that, as a collections officer, he called people with past-due accounts to attempt to collect the balances. (Tr. 45). Plaintiff testified that he also worked at a publications company collecting on advertising accounts. (Id.).

Plaintiff stated that he is unable to work presently due to his neck problems. (Id.). Plaintiff testified that he is unable to hold his head in an upright position for longer than about four hours. (Id.). Plaintiff stated that he was experiencing difficulty holding his head during the hearing and that he was propping his head up with his hands. (Id.). Plaintiff testified that he has a pinched nerve in his neck and experiences a tingling sensation in his spine following neck surgery.

(Id.).  Plaintiff stated that he experiences pain that shoots down his neck and forces him to lie down.  (Id.).  Plaintiff testified that he occasionally experiences the pain for three to five hours even when he is lying down.  (Id.).

Plaintiff stated that he attended physical therapy at the VA after his surgery.  (Tr. 46).  Plaintiff testified that he was discharged from physical therapy in 2002 and was instructed to do his exercises at home.  (Id.).

Plaintiff stated that Dr. Joseph Sherrill performed surgery on his neck in October of 2001, which was plaintiff's second neck surgery.  (Id.).  Plaintiff testified that he last saw Dr. Sherrill on June 2, 2003.  (Id.).  Plaintiff stated that he has been seeing Dr. Crafts for his neck since that time.  (Tr. 47).  Plaintiff testified that he sees Dr. Crafts every six months to a year.  (Id.).  Plaintiff stated that he had last seen Dr. Crafts some time prior to June 2003.  (Id.).

Plaintiff testified that he underwent a hernia operation in October of 2003.  (Id.).  Plaintiff stated that he had an appointment with his primary care provider the day following the hearing due to increased pain he had been experiencing for several days prior to the hearing.  (Id.).

Plaintiff testified that his primary care physician is Dr. Shockmurray at the VA.  (Tr. 48).  Plaintiff stated that he usually sees Dr. Shockmurray approximately every six months.  (Id.).  Plaintiff testified that he had last seen Dr. Shockmurray in August of 2003.  (Id.).

Plaintiff stated that he takes Naproxen,[1] Baclofen,[2] and Oxycontin.[3]  (Id.).  Plaintiff testified that he also takes Valium[4] at night to help him sleep.  (Tr. 49).  Plaintiff stated that he was taking an antibiotic at the time of the hearing for a skin infection.  (Id.).  Plaintiff testified that he also takes Zantac[5] for upset stomach caused by the Oxycontin, and Benadryl for itchiness. (Id.).

Plaintiff stated that he was diagnosed with the skin condition a year prior to the hearing. (Id.).  Plaintiff testified that his skin condition, which is essentially body acne, is slowly improving with medication. (Tr. 49).

Plaintiff then requested a glass of water.  (Id.).  Plaintiff stated that his voice cracks after talking extensively due to his 2001 surgery.  (Id.).  Plaintiff testified that he also has an enlarged larynx, which causes difficulty eating and swallowing.  (Tr. 50).  Plaintiff stated that he has not received any treatment for these problems, despite his complaints to his doctors.  (Id.).  Plaintiff testified that he is unable to take any over-the-counter medications at the nursing home without orders from his doctor.  (Id.).  Plaintiff stated that he has no income.  (Id.).

Plaintiff testified that he enjoys genealogy as a hobby to pass the time in the nursing home.

---

[1]Naproxen is a non-steroidal anti-inflammatory drug indicated for the management of pain associated with osteoarthritis.  See Physician's Desk Reference (PDR), 2874-75 (59th Ed. 2005).

[2]Baclofen is a muscle relaxer indicated for the treatment of muscle spasm.  See PDR at 3296.

[3]Oxycontin is an opioid analgesic indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time.  See PDR at 2818-19.

[4]Valium is indicated for the management of anxiety disorder.  See PDR at 2957.

[5]Zantac is indicated for the treatment of gastric ulcer.  See PDR at 1671.

(Id.).  Plaintiff stated that he studies census data, which he then sends to his father who enters the data into the computer and sends it back to him.  (Id.).  Plaintiff testified that his father lives in Louisiana.  (Tr. 51).  Plaintiff stated that he collected the genealogy records from libraries prior to undergoing surgery so that he would have something to do following surgery.  (Id.).  Plaintiff testified that he collects census records, death certificates, and land records.  (Id.).  Plaintiff stated that he obtained these records by writing to the various county clerks.  (Tr. 52).  Plaintiff testified that his father then pays for the records.  (Id.).  Plaintiff stated that he works on his genealogy project sporadically.  (Id.).  Plaintiff testified that he sometimes works for two to three hours at a time and then does not work again for four weeks.  (Id.).

Plaintiff stated that when he is not working on his genealogy project, he mostly lies down to alleviate his pain.  (Id.).  Plaintiff testified that the Naproxen does not provide any pain relief.  (Id.).  Plaintiff stated that the Oxycontin provides some relief, although he cannot take it frequently.  (Id.).  Plaintiff testified that he has been taking two Oxycontin pills every six to seven hours since he underwent hernia surgery.  (Id.).  Plaintiff stated that prior to undergoing hernia surgery, he took Oxycontin two to three times a week, as needed.  (Tr. 53).  Plaintiff testified that in September and October of 2003, he hardly ever took Oxycontin and would just lie down to ease his pain.  (Id.).

Plaintiff stated that since he stopped attending physical therapy, he has been doing exercises at home.  (Id.).  Plaintiff testified that he does exercises to strengthen his neck muscles while sitting in a chair.  (Tr. 54).  Plaintiff stated that he is supposed to perform his exercises in sets of ten three times a day.  (Id.).  Plaintiff testified that he is sometimes able to exceed the amount of repetitions, and other times, he is unable to compete the prescribed amount of

repetitions due to pain. (Id.).

Plaintiff stated that on a typical day, he wakes up at 6:00 a.m., showers, brushes his teeth, gets dressed, and goes downstairs to drink coffee. (Id.). Plaintiff testified that he drinks coffee and smokes cigarettes in the morning. (Id.). Plaintiff stated that he occasionally eats breakfast, but is unable to eat sometimes because the odors in the nursing home upset his stomach. (Id.). Plaintiff testified that after he has his coffee and smokes cigarettes, he tries to stay upright for three to four-and-a-half hours, after which he lies down for about an hour to an hour-and-a-half, and then gets up for a couple more hours. (Tr. 55). Plaintiff stated that before he lies down, he watches television, talks to other residents, and reads magazines. (Id.).

Plaintiff testified that residents are allowed to leave the nursing home. (Id.). Plaintiff stated that he does not walk outside because the neighborhood is not safe. (Id.). Plaintiff testified that the only family member he has in town is a second cousin who lives in St. Charles. (Id.). Plaintiff stated that he occasionally sees his second cousin. (Tr. 56). Plaintiff testified that he sees his second cousin on holidays and once or twice during the rest of the year. (Id.). Plaintiff stated that his parents and brother live in Louisiana. (Id.).

Plaintiff testified that he relocated to Missouri from Louisiana because he had problems with the New Orleans VA. (Id.). Plaintiff stated that the New Orleans VA did not believe he had a serious neck problem. (Id.). Plaintiff testified that John Cochran VA eventually took his complaints seriously and operated on his neck. (Id.). Plaintiff stated that he tried some other VA hospitals between New Orleans and St. Louis. (Id.). Plaintiff testified that the Jackson, Mississippi VA hospital ran some tests and told him there was nothing wrong with his neck. (Id.). Plaintiff stated that he had been complaining to the VA about neck problems since 1988. (Id.).

Plaintiff testified that the VA hospital did nothing about his complaints, other than take x-rays and CT scans. (Tr. 57).

Plaintiff stated that he has no difficulty taking care of any of his personal needs, such as dressing, feeding, bathing, or shaving. (Id.). Plaintiff testified that he does not do any of his own laundry or cooking. (Id.).

Plaintiff stated that the nursing home in which he lives is located three blocks north of the Fox Theatre in John Cochran VA Hospital. (Id.). Plaintiff testified that the neighborhood in which the nursing home is located is bad. (Id.). Plaintiff stated that several nursing home employees experienced car thefts, and one employee was mugged. (Id.). Plaintiff testified that he never walks in the Grand Mid-Town area because he believes it is a bad neighborhood and because he has no money to spend. (Tr. 58). Plaintiff stated that prolonged standing and walking are difficult for him. (Id.).

Plaintiff testified that the nursing home requires that the residents have transportation when they leave the premises. (Id.). Plaintiff stated that the nursing home only provides transportation for doctor appointments and scheduled activities. (Id.). Plaintiff testified that the nursing home's scheduled activities include shopping trips, although these trips are rare. (Id.). Plaintiff stated that he occasionally rides with the office manager to activities. (Id.). Plaintiff testified that his cousin occasionally picks him up. (Id.). Plaintiff stated that he does not stay overnight with his cousin because residents are only given limited overnight visits and he uses his when his parents visit. (Id.). Plaintiff testified that his parents visit every four to six months. (Tr. 59). Plaintiff stated that his siblings do not visit him. (Id.).

Plaintiff asked the ALJ if he could adjust the microphone so that he could lean back and

rest his head against the wall to rest his neck. (Id.). The ALJ indicated that the microphone would pick him up if he leaned back. (Id.).

Plaintiff testified that he occasionally wears a neck brace. (Id.). Plaintiff stated that he wore the neck brace to the hearing due to the road conditions on that day. (Id.). Plaintiff indicated that there was snow and ice on the roads on the day of the hearing. (Id.). Plaintiff testified that Dr. Sherrill advised him to only wear the brace if necessary because his neck muscles would not strengthen if he wore the brace continuously. (Tr. 60).

Plaintiff stated that he gets his medication from Interlock Pharmacy and the VA. (Id.). Plaintiff testified that Naproxen, Baclofen, Valium, Zantac, and Benadryl come from Interlock Pharmacy. (Id.). Plaintiff stated that he also takes Zyban[6] to help him quit smoking, which he gets from Interlock Pharmacy. (Id.). Plaintiff testified that the Zyban has not been effective in helping him to quit smoking. (Id.). Plaintiff stated that he gets his antibiotic, Oxycontin, and Percocet from the VA. (Id.).

Plaintiff testified that he does not wear any supportive device other than the neck brace. (Tr. 61). Plaintiff stated that he started using a cane a few days prior to the hearing so he would not aggravate his hernia following surgery. (Id.). Plaintiff testified that prior to that, he had not used the cane for over a year. (Id.).

Plaintiff stated that the Oxycontin causes mild side effects, such as itchiness and a minor upset stomach. (Id.). Plaintiff testified that he has informed Dr. Crafts of these side effects. (Id.). Plaintiff stated that the Baclofen and Naproxen are not working. (Id.). Plaintiff testified that he has an appointment with his primary care doctor, Dr. Shockmurray, the day following the hearing

---

[6]Zyban is indicated as an aid to smoking cessation treatment. See PDR at 1692.

to discuss his medications. (Tr. 62). Plaintiff stated that he makes appointments with Dr. Shockmurray by calling the nurse coordinator for the clinic. (Id.). Plaintiff testified that appointments are scheduled based on the urgency. (Id.). Plaintiff stated that it is possible to obtain a same day appointment. (Id.).

Plaintiff's attorney indicated that he would submit the records from plaintiff's appointment with Dr. Shockmurray. (Id.). Plaintiff's attorney then examined plaintiff, who testified that he had been resting his head on his hands during the hearing before he leaned back to rest his head on the wall. (Tr. 63). Plaintiff stated that he was resting his head because his neck was hurting and he was unable to hold his head upright. (Id.). Plaintiff testified that the pain he was experiencing during the hearing was the same amount of pain he experiences on a typical day. (Id.).

Plaintiff stated that on a typical day, he spends between two and five hours lying down to control his symptoms. (Id.). Plaintiff testified that he usually lies down around lunchtime and sleeps until about 2:00p.m. (Id.). Plaintiff stated that the longest amount of time he can stay in an upright position is about six hours when he takes the Oxycontin. (Id.). Plaintiff testified that he has had these limitations since he underwent neck surgery. (Tr. 64).

Plaintiff stated that he has been getting worse since undergoing surgery. (Id.). Plaintiff testified that his neck and shoulder pain has been increasing. (Id.). Plaintiff stated that he experiences cramps and spasms in the left side of his neck that go down to his left shoulder. (Id.). Plaintiff testified that he experiences more pain when he moves around. (Id.). Plaintiff stated that he experiences this pain daily. (Tr. 65).

The ALJ then re-examined plaintiff, who testified that his primary care doctor is at John Cochran VA Hospital. (Id.). Plaintiff stated that the nursing home provides transportation to his

doctor appointments.  (Id.).  Plaintiff testified that the nursing home is located two blocks from the hospital, although he will not walk to his appointments for safety reasons.  (Id.).

The ALJ next examined the vocational expert, Dr. Glenn White, who testified that he was present during plaintiff's testimony and that he had reviewed the exhibits.  (Tr. 66).  Dr. White questioned plaintiff, who testified that the heaviest thing he had to lift as a copy machine operator was a box of paper that weighed at least forty pounds.  (Tr. 67).  Plaintiff stated that at his collection jobs, he was mostly seated.  (Id.).  Dr. White stated that plaintiff's work as an auditor would be classified as sedentary and skilled, his work as a copy machine operator is classified as medium and unskilled, and his work in collections is classified as sedentary and semi-skilled. (Id.).

The ALJ then asked Dr. White to assume a hypothetical individual of plaintiff's age, education, and work experience, with the limitation of avoiding lifting greater than ten pounds. (Id.).  Dr. White testified that this limitation would only eliminate plaintiff's copy machine operator position.  (Tr. 68).

The ALJ next asked Dr. White to add the limitation of using a device to support the neck and head, such as using a neck brace or leaning against the wall to support the head occasionally during the workday.  (Id.).  Dr. White testified that this limitation would not preclude plaintiff's past work as long as the individual was able to remain at the work station.  (Id.).  Dr. White stated that if this limitation took the individual away from the work station for periods of time outside regular breaks then it would preclude plaintiff's past relevant work and all other work. (Id.).

Plaintiff's attorney then examined Dr. White, who testified that if plaintiff's testimony

during the hearing regarding the need to lie down, the need to support his head, the complaints of pain, and the inability to move his head from side-to-side were assumed to be true, then gainful employment would be precluded.  (Tr. 69).  Dr. White stated that no jobs would allow an employee to lie down for periods of two to five hours during the workday.  (Id.).

The ALJ asked plaintiff's attorney if he would like to obtain more records from Saint Louis University.  (Id.).  Plaintiff's attorney indicated that plaintiff had not returned to Saint Louis University for treatment.  (Tr. 70).

## B.    Relevant Medical Records

In a "Statement of the Case" issued by Veteran's Affairs on August 11, 1995, it was noted that plaintiff had walked into a pipe on January 15, 1980, and injured his neck.  (Tr. 206).  Plaintiff also reported a history of falling twelve feet in June 1981 in the Navy and breaking his neck, with a posterior fusion of C1-2[7] in December 1983.  (Tr. 207).

Plaintiff presented to the Veteran's Administration Medical Center ("VA") on March 13, 2001, with complaints of pain in the head, right shoulder, neck, and lower back.  (Tr. 247).  It was noted that plaintiff had undergone back surgery in 1983.  (Id.).  The impression/diagnosis was neck and shoulder pain.  (Tr. 248).

On March 16, 2001, plaintiff complained of severe right shoulder, neck, and lumbar spine

---

[7]Abbreviation for cervical vertebra.  The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See Medical Information Systems for Lawyers, § 6:27.

pain. (Tr. 305). Plaintiff reported neck pain radiating to the right shoulder. (Id.). The VA gave plaintiff a cervical collar, secondary to cervical pain with a history of cervical fracture and status post fusion. (Tr. 304).

Plaintiff underwent a CT scan on July 24, 2001, which revealed a possible fracture of the C2 vertebrae posteriorly. (Tr. 272).

Plaintiff was seen by neurosurgeon Dr. Crafts at the VA on September 18, 2001. (Tr. 269). It was noted that Dr. Crafts referred plaintiff to Dr. Sherrill at Saint Louis University, who would perform a revisional operation at C1-2. (Id.). Plaintiff underwent x-rays of the cervical spine, which revealed transverse fracture of the odontoid process,[8] but no acute fracture or dislocation of the cervical spine. (Tr. 256).

The VA issued a wood cane to plaintiff on October 5, 2001, secondary to an unsteady compromised gait. (Tr. 333).

Dr. Joseph Sherrill performed a surgical revision of the fusion at C1-C2 on October 17, 2001, at Saint Louis University Hospital. (Tr. 664).

Plaintiff saw Dr. Sherrill for a follow-up on November 5, 2001, at which time Dr. Sherrill found that plaintiff's wounds were well-healed, plaintiff was normal neurologically, plaintiff was doing quite well with regard to lower extremity function and hand function, and plaintiff had experienced a complete elimination of his radiating right shoulder, head, and arm pain. (Tr. 677). Dr. Sherrill instructed plaintiff to continue wearing his prescribed collar and return in one month. (Id.).

---

[8]The tooth-like process of the second cervical vertebra. See Stedman's Medical Dictionary, 1357 (28th Ed. 2006).

The VA issued a neck collar to plaintiff on November 6, 2001. (Tr. 329).

Plaintiff saw Dr Sherrill on November 26, 2001, at which time plaintiff reported taking Valium a few times a day. (Tr. 680). Dr. Sherrill stated that plaintiff probably does not need the Baclofen any longer. (Id.). Dr. Sherrill stated that plaintiff had done "quite well." (Id.).

Plaintiff saw Dr. Sherrill on January 21, 2002, at which time Dr. Sherrill found that plaintiff had done quite well. (Tr. 682). Plaintiff reported that his pain was down to a three to four out of ten, at most, and that he was no longer taking any narcotics. (Id.). Dr. Sherrill stated that plaintiff's films looked good and that plaintiff may have a union already. (Id.). Dr. Sherrill indicated that he would wean plaintiff away from his collar over the next few weeks. (Id.).

On February 25, 2002, Dr. Sherrill stated that plaintiff moved his head fairly well with the obvious limitations at the C1-2 junction. (Tr. 684). Dr. Sherrill found no evidence of neck pain recurrence and noted that plaintiff's films were stable. (Id.). Dr. Sherrill prescribed physical therapy. (Id.).

An April 29, 2002 note reveals that plaintiff participated in physical therapy at the VA. (Tr. 317). Plaintiff complained of neck pain and he continued to wear his neck collar intermittently. (Id.). Plaintiff indicated that he lived in a nursing home, although he planned to return to his home in Arnold. (Id.). Plaintiff reported that his neck feels weak and becomes sore after the brace is off for more than five minutes. (Id.). It was noted that plaintiff was independently ambulating community distances and uses a straight cane. (Id.).

A physical therapy note dated May 20, 2002, indicates that plaintiff still complained of significant pain, although his range of motion improved. (Tr. 352).

Plaintiff saw Dr. Sherrill on June 3, 2002, at which time Dr. Sherrill stated that plaintiff had

done fairly well post-operatively. (Tr. 688). Dr. Sherrill indicated that plaintiff was without pain medications, except that he took Baclofen for spasms. (Id.). Dr. Sherrill continued plaintiff on his daily exercises and intermittent collar wearing. (Id.). Dr. Sherrill stated that "I would expect him to probably be out of commission as far as work is concerned until he is one year out from this operation since, as you will recall, he has a revisional operation for C1-2 that was done many years ago. I expect him to be looking at regular activities in October of 2002 and I would like to see his plain films in that month as well." (Id.). Dr. Sherrill stated that plaintiff was doing quite well neurologically and had very little pain and no deficits. (Id.).

Plaintiff underwent an x-ray of the cervical spine on June 5, 2002, which revealed postoperative changes, with no abnormality. (Tr. 251).

Plaintiff was seen for physical therapy at the VA on June 11, 2002, at which time it was noted that plaintiff was no longer using a cane for ambulation and was able to tolerate longer time periods without a neck brace. (Tr. 319). Plaintiff rated his pain as a two to three out of ten, with stiffness as his primary complaint. (Id.). Plaintiff's range of motion had improved. (Id.).

Plaintiff presented for physical therapy on June 24, 2002, at which time plaintiff complained of neck pain. (Tr. 660). It was noted that plaintiff continued to tolerate longer time periods without his cervical collar. (Id.).

On July 29, 2002, Dr. Sherrill completed a questionnaire at the request of the State agency, in which he indicated that plaintiff did not require an assistive device for ambulation, plaintiff was able to lift or carry less than ten pounds on a frequent or occasional basis, and was not able to work yet. (Tr. 693). Dr. Sherrill stated that plaintiff should not return to work until one year out from surgery, which is approximately October of 2002. (Tr. 694).

A physician from Grand Manor nursing home discontinued plaintiff's prescription for Tylenol with Codeine on February 25, 2003. (Tr. 705).

Plaintiff saw Dr. Sherrill on June 2, 2003, for a follow-up. (Tr. 758). Dr. Sherrill noted that plaintiff's films were good. (Id.). Dr. Sherrill stated "I think that he would be very good to go at this point. Unfortunately, he has had quite a bit of atrophy of his post-operative wounds in his paraspinal muscle, mainly his trapezius and his erector spinae group. He has a very tired neck and head." (Id.). He noted that neurologically, plaintiff was very good, and that plaintiff's fusion had taken well. (Id.). Dr. Sherrill indicated that he would follow plaintiff for up to five years to make sure that he does not develop any new problems, although this would be unlikely. (Id.). Dr. Sherrill recommended that plaintiff continue to do exercises to strengthen his neck. (Id.). He indicated that he would see plaintiff next in one year. (Id.).

Plaintiff presented to the VA on February 9, 2004, in stable condition. (Tr. 760). Plaintiff requested a copy of his medication profile for the nursing home. (Id.). Plaintiff indicated that he was at the nursing home for rehabilitation following neck surgery. (Id.).

Plaintiff saw Raymond Leung, M.D. for a consultative examination on April 26, 2004. (Tr. 766-75). Dr. Leung noted complaints of neck fracture, decreased left eye vision, and decreased hearing. (Tr. 766). Plaintiff reported that surgery helped his neck pain somewhat, although he continued to experience pain that varied in intensity and increases with movement. (Id.). Plaintiff indicated that his neck pain was not radiating and that Vicodin[9] helped somewhat. (Id.). Plaintiff reported difficulty with bending, squatting, and prolonged sitting, although he was capable of

_____

[9]Vicodin is a semisynthetic narcotic analgesic and antitussive indicated for the relief of moderate to moderately severe pain. See PDR at 526.

standing fairly well without any difficulties. (Tr. 767). Plaintiff indicated that he could walk three blocks. (Id.). Plaintiff stated that he uses a cane occasionally for pelvic pain and stability, although he can walk without it. (Id.). Upon physical examination, Dr. Leung noted that plaintiff walked with a mild limp both with and without the cane. (Tr. 768). Plaintiff was able to walk fifty feet unassisted. (Id.). Plaintiff was able to heel walk with his cane, was able to toe walk with his cane, and was able to squat. (Id.). Plaintiff was able to forward flex to 90 degrees without vertebral tenderness. (Id.). Plaintiff had no paralumbar spasms, no difficulty getting on and off of the examination table, normal leg and grip strength, and no muscle atrophy. (Id.). Plaintiff had decreased range of motion in the right knee due to his groin pain. Plaintiff also had decreased range of motion in his neck, with rotation to the right limited to ten degrees and to the left to thirty degrees, lateral flexion to the left and to the right limited to five degrees, and flexion and extension normal. (Tr. 769). Plaintiff's right arm strength was slightly decreased, at four out of five. (Id.). Dr. Leung's impression was: history of fracture to C1 and C2 status post fusion, decreased range of motion in the neck; decreased vision, visual acuity in the left eye was 20/40 and in the right eye was 20/25 without his glasses; and decreased hearing, he wears a hearing aid on the right side and was able to hear normal conversational volumes with his hearing aid without any apparent difficulty. (Id.).

Dr. Leung completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 772-75). Dr. Leung expressed the opinion that plaintiff could occasionally and frequently lift ten pounds; stand or walk for at least two hours in an eight-hour workday; sit for an unlimited amount of time; was limited in his ability to push or pull with his right arm; could only occasionally climb, balance, kneel, crouch, crawl, or stoop; had no limitations in his ability to reach,

handle, finger, and feel; his ability to hear was limited in his right ear; and was limited in terms of exposure to hazards such as machinery and heights due to his decreased range of motion of the neck secondary to pain at C1 to C2.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits as of the established onset date.

2. The claimant has not engaged in substantial gainful activity since February 25, 2001.

3. The medical evidence establishes that the claimant has the following impairments: a history of two fusions at C1-C2 to correct a vertebral and odontoid process fracture, decreased vision and hearing, a recent right inguinal hernia operation, and a history of alcohol dependence and marijuana abuse.

4. The claimant's history of alcohol dependence and marijuana abuse is not a contributing factor material to the determination of disability.

5. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

6. The claimant's assertions concerning his ability to work are partially credible.

7. From February 25, 2001 through October 12, 2002, the claimant retained the residual functional capacity to lift/carry no more than 10 pounds occasionally, except that he could not perform the full range of sedentary work because, even if he were permitted to alternate at will between sitting, standing, and walking, he still would not have been able to maintain a regular work schedule, and remain at a work site and sustain productivity throughout an 8-hour work day, 5 days per week without lying down outside customary work breaks.

8. From February 25, 2001 through October 12, 2002, the claimant was unable to perform either his past relevant work or any other substantial gainful activity existing in significant numbers.

9. The claimant was under a disability beginning February 25, 2001, and continuing through October 12, 2002.

10.    As of October 13, 2002, the claimant's medical condition improved, and there was a decrease in his objective signs and symptoms.

11.    As of October 13, 2002, the claimant's medically diagnosed impairments still did not meet or medically equal the criteria and severity of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

12.    As of October 13, 2002, and continuing through the present, the claimant has had the residual functional capacity to occasionally lift/carry 10 pounds; stand/walk at least 2 hours in an 8 hour work day; occasionally climb ramps and stairs; never climb ropes and scaffolds; and occasionally balance, stoop, crouch, crawl and kneel.  He is right hand dominant, and his right arm is slightly weaker than the left.  He can hear conversational speech and can see to read with glasses.  He must avoid working at dangerous heights and around dangerous unprotected machinery.

13.    As of October 13, 2002, the claimant retained the residual functional capacity to return to his past relevant work as an auditor and as a loan officer.  In the St. Louis area and in the State of Missouri, respectively, there are 6,000 and 20,000 auditor positions, as well as 3,000 and 6,000 loan officer positions.

14.    The claimant was under a disability beginning February 25, 2001, and continuing through October 12, 2002.

15.    On October 13, 2002, the claimant's disability ceased, and the claimant has not been under a disability at any time from October 13, 2002, through the date of this decision.

(Tr. 24-25).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application for Disability Insurance Benefits under sections 216(I) and 223 of the Social Security Act protectively filed on May 6, 2002, the claimant is entitled to a period of disability commencing February 25., 2001, and continuing through October 12, 2002.

It is the further decision of the Administrative Law Judge that the claimant's disability ceased on October 13, 2002, and that his entitlement to Disability Insurance Benefits terminated on December 31, 2002, the end of the second

calendar month following the month in which his disability ceased.

It is the further decision of the Administrative Law Judge that the claimant has not been under a disability at any time from October 13, 2002, through the date of this decision.

(Tr. 26).

## Discussion

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 ©)), 416.920 ©)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed

to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.

See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c)), 416.920a ©)). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.  Plaintiff's Claims

Plaintiff raises three claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in formulating plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations.  Plaintiff also contends that the hypothetical posed to the vocational expert was erroneous.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

### 1.    Credibility Analysis

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of

the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when [h]e claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors.  (Tr. 20).  The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.  The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints.  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first stated that there was no medical evidence to support plaintiff's allegations of disability due to poor hearing and vision.  (Tr. 21).  The ALJ noted that plaintiff was able to hear, without difficulty, the questions posed to him during the hearing, and did not ask for any questions to be repeated.  (Id.).  The ALJ pointed out that there was no evidence that plaintiff's decreased vision was severe enough to result in any work-related limitations.  (Id.).

- 25 -

With regard to plaintiff's neck impairment, the ALJ stated that the notes of plaintiff's treating physician, Dr. Joseph Sherrill, do not support a finding of disability during the relevant time period. (Tr. 21-22). The ALJ stated that Dr. Sherrill's treatment notes reveal that plaintiff's neck condition improved after surgery. (Tr. 22). For example, in June 2002, Dr. Sherrill noted that plaintiff had done fairly well post-operatively, plaintiff did quite well neurologically, there was evidence of a union, and that plaintiff had very little in the way of pain. (Tr. 22, 688). Dr. Sherrill stated that plaintiff should be able to resume regular activities in October of 2002. (Id.).

The ALJ discussed plaintiff's prescription pain medications. (Tr. 23). The ALJ noted that, although plaintiff testified that he takes narcotic pain medications that do not help with the pain, Dr. Sherrill does not prescribe these medications and indicated that plaintiff no longer needed narcotics. (Tr. 23, 680, 682, 688). The ALJ stated that, although another physician prescribed narcotics, Dr. Sherrill's opinion was entitled to greater weight as plaintiff's treating physician who performed plaintiff's cervical surgery. (Tr. 23-24).

The ALJ also discussed plaintiff's daily activities. (Tr. 20). Plaintiff testified that he is able to take care of his daily personal needs, socializes with residents, reads, watches television, and works on a genealogy project as a hobby. (Tr. 20, 50-55). Plaintiff indicated that he did not walk outside because the neighborhood in which the nursing home is located is unsafe. (Tr. 55).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors

and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241

F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for

discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's

complaints are not credible is supported by substantial evidence.

## 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity.

Specifically, plaintiff contends that the ALJ relied on the opinion of the consulting physician, Dr.

Leung, and failed to give proper weight to the opinion of treating physician Dr. Sherrill.

The ALJ made the following determination regarding plaintiff's residual functional

capacity:

> Accordingly, the undersigned finds that as of October 13, 2002, the claimant's medical
> condition improved, and he still did not have any medically diagnosed impairment that
> met or equaled the criteria and severity of any Listed impairment.  Moreover, beginning
> October 13, 2002, and continuing through the present, the claimant has had the residual
> functional capacity to occasionally lift/carry 10 pounds; stand/walk at least 2 hours in an
> 8 hour work day; occasionally climb ramps and stairs; never climb ropes and scaffolds;
> and occasionally balance, stoop, crouch, crawl and kneel.  He is right hand dominant, and
> his right arm is slightly weaker than the left.  He can hear conversational speech and can
> see to read with glasses.  He must avoid working at dangerous heights and around
> dangerous unprotected machinery.

(Tr. 23).

Determination of residual functional capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional

capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to

function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting

Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual

functional capacity is "based on all the evidence in the record, including 'the medical records,

observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff contends that the ALJ erred in relying on the opinion of consulting physician Dr. Leung rather than the opinion of treating physician Dr. Sherrill. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148. Such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch, 201 F.3d at 1013.

The ALJ indicated that he was accepting Dr. Leung's opinion as to plaintiff's residual functional capacity. Dr. Leung expressed the opinion that plaintiff could occasionally and frequently lift ten pounds; stand or walk for at least two hours in an eight-hour workday; sit for

an unlimited amount of time; was limited in his ability to push or pull with his right arm; could only occasionally climb, balance, kneel, crouch, crawl, or stoop; had no limitations in his ability to reach, handle, finger, and feel; his ability to hear was limited in his right ear; and was limited in terms of exposure to hazards such as machinery and heights due to his decreased range of motion of the neck secondary to pain at C1 to C2. (Tr. 772-75).

The ALJ noted that Dr. Sherrill had previously indicated that plaintiff would not be able to perform any substantial gainful activity for one year following his cervical fusion revision. (Tr. 23). The ALJ stated that Dr. Sherrill's records reveal that plaintiff's condition did in fact improve within twelve months of surgery. (Tr. 23). The ALJ indicated that, in the absence of any specific limitations from Dr. Sherrill, he would give plaintiff the benefit of the doubt and accept Dr. Leung's more specific restrictions. The ALJ found that Dr. Leung's opinion regarding plaintiff's restrictions was not inconsistent with Dr. Sherrill's opinion.

Plaintiff contends that Dr. Sherrill's treatment notes indicate that plaintiff had disabling limitations. Specifically, plaintiff points to the fact that Dr. Sherrill noted atrophy in plaintiff's neck and a limited range of motion on June 2, 2003. (Tr. 758). Although Dr. Sherrill noted that plaintiff had atrophy and a tired neck, he did not impose any restrictions due to these findings. Rather, Dr. Sherrill simply recommended that plaintiff continue to do exercises to strengthen his neck. (Tr. 758). Dr. Sherrill also noted that it was unlikely, in his opinion, that plaintiff would develop any new problems. (Id.). As such, Dr. Sherrill's treatment notes do not reveal disabling limitations.

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. The ALJ adapted the residual functional capacity findings of

Dr. Leung, who examined plaintiff in April 2004. (Tr. 766-75). The residual functional capacity is consistent with the records of Dr. Sherrill, who indicated that plaintiff would be able to return to his regular activities one year following surgery. (Tr. 688). Dr. Sherrill's treatment notes reveal that plaintiff recovered from surgery, as he had predicted. Although Dr. Sherrill noted some atrophy in June 2003, this would not preclude the performance of work within the limitations found by the ALJ.

**3.      Vocational Expert Testimony**

Plaintiff also argues that the hypothetical posed to the vocational expert was erroneous because it was based on a residual functional capacity that is not supported by substantial evidence.

The undersigned has found that the ALJ's residual functional capacity determination is supported by substantial evidence. The ALJ found that plaintiff had the residual functional capacity to return to his past sedentary work as an auditor and as a loan officer. (Tr. 25). For this reason, no vocational expert testimony was required. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) ("[u]nder the five-step analysis of social security cases, when a claimant can perform his past relevant work, he is not disabled. Once this decision is made ... the services of a vocational expert are not necessary.") (quoting Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)). Although vocational expert testimony was not required, the ALJ obtained assistance from a vocational expert in making the determination that plaintiff was capable of performing his past relevant work. Thus, no error can be found in the hypothetical posed to the vocational expert.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.


The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


Dated this ___9th___ day of February, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE